The ESTATE OF Nellie S. JOHNSTON, Deceased, by Robert B. PAYNE, Independent Executor, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. CA 3–79–1271–G.

United States District Court,
N.D. Texas,
Dallas Division.

April 27, 1984.

---

Robert B. Payne and Robert Q. Stanton, Dallas, Tex., for plaintiff.

Martha Joe Stroud, Asst. U.S. Atty., Michael E. Greene and Steven Shapiro, Tax Div., Dallas, Tex., for defendant.

## MEMORANDUM ORDER

FISH, District Judge.

### Question Presented

These cross-motions for summary judgment present the following question of first impression concerning the federal estate tax: When a decedent's estate is valued on the alternate valuation date (i.e., six months after the date of death), should that value include proceeds from the sale of oil and gas produced since the date of death? In other words, do such proceeds represent a change in form of assets of the gross estate, or do they constitute income?

### Undisputed Facts

The facts are not in dispute. At the time of Nellie S. Johnston's death on January 27, 1974, she owned royalty and working interests in numerous oil and gas properties, principally in the state of Texas. Her executor elected to value the gross estate on the alternate valuation date (six months after death), rather than at the date of death, as permitted by Section 2032 of the Internal Revenue Code of 1954, 26 U.S.C. § 2032. During that six months, the sale of oil and gas generated net proceeds to the estate of $156,011, on which the executor duly paid income tax. The executor did not, however, include any part of these proceeds in the value of the gross estate.

Several years later the Internal Revenue Service assessed a deficiency against the estate, which was contested but paid, subject to this suit for refund. Part of the suit, a dispute over the valuation of certain assets in the estate, has been settled. The question remaining for decision is whether the decedent's gross estate also includes the six months of net production proceeds described above.

A determination of what the gross estate includes must begin with the definition of gross estate contained in 26 U.S.C. § 2031:

### § 2031. Definition of gross estate

(a) General.—The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.

An exception to § 2031's rule for valuing all assets at the date of death is provided by § 2032:

### 26 U.S.C. § 2032. Alternate valuation

(a) General.—The value of the gross estate may be determined, if the executor so elects, by valuing all the property included in the gross estate as follows:

(1) In the case of property distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall be valued as of the date of distribution, sale, exchange, or other disposition.

(2) In the case of property not distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall be valued as of the date 6 months after the decedent's death.

\*  \*  \*  \*  \*  \*

The corresponding regulation interprets the statute as follows:

### 26 C.F.R. § 20.2032–1. Alternate valuation.

(a) In general. In general, section 2032 provides for the valuation of a decedent's gross estate at a date other than the date of the decedent's death. More specifically, if an executor elects the alternate valuation method under section 2032, the property included in the decedent's gross estate on the date of his death is valued as of whichever of the following dates is applicable:

(1) Any property distributed, sold, exchanged, or otherwise disposed of within

6 months (1 year, if the decedent died on or before December 31, 1970) after the decedent's death is valued as of the date on which it is first distributed, sold, exchanged, or otherwise disposed of;

(2) Any property not distributed, sold, exchanged, or otherwise disposed of within 6 months (1 year, if the decedent died on or before December 31, 1970) after the decedent's death is valued as of the date 6 months (1 year, if the decedent died on or before December 31, 1970) after the date of the decedent's death.

\*  \*  \*  \*  \*  \*

Thus, the property to be included in Nellie S. Johnston's gross estate is that which she possessed on the date of death, although six months separate the two dates on which that same property may be valued.[1]

The nature of the (estate) tax is an excise tax on the transmission of the property from the decedent to his heirs, legatees or distributees. *Clark v. U.S.*, 33 F.Supp. 216, 219 (D.Md.1940). The estate tax therefore does not reach any property not owned (or previously transferred) by the decedent at the time of his death, and income subsequently arising from the taxable corpus of the gross estate received by the decedent's beneficiaries is taxable to them as income. *Id.*

### Piecemeal Sale Under Texas Law

Although the net production proceeds did not exist as part of Nellie Johnston's gross estate on the date of her death, the government contends that such proceeds are nevertheless part of her estate because production of oil and gas, which is a wasting asset, reduces the whole of that property which belonged to the decedent at the date of her death, thereby converting what was formerly corpus into income. The

---

**1.** The forerunner of Section 2032 did not require explanation by such a regulation as 26 C.F.R. § 20.2032.1, for it unmistakably provided in the statute itself that

"If the executor of an estate so elects upon his return ... the value of the gross estate shall be determined by valuing *all the property in-*

*cluded therein on the date of the decedent's death* as of the date one year after the decedent's death ..." [emphasis added].
26 U.S.C. § 811(j) (1935). *See Maass v. Higgins,* 312 U.S. 443, 444 n. 1, 61 S.Ct. 631, 632, 85 L.Ed. 940 (1941).

government maintains that such a piecemeal sale of assets can give rise to both income tax and estate tax consequences.

■ In support of its theory that net production proceeds constitute a fractionalization and piecemeal sale of the decedent's interest in oil and gas in place at the time of her death, the government relies on the Texas law of oil and gas, although it acknowledges that state law is not always controlling in determining property interests for federal tax purposes. The government emphasizes authority such as *Norris v. Vaughan,* 152 Tex. 49, 260 S.W.2d 676, 679 (1953), where the Texas Supreme Court decided that royalty paid for oil and gas produced from the separate property of a lessor belonged to his separate estate rather than to the community on grounds that extraction of minerals is "equivalent to a piecemeal sale of the separate corpus ..." and "that oil and gas producing territory will become exhausted in time."

More is involved in this case than a Texas community property question. This court must attempt "to give a uniform application to a nation-wide scheme of taxation" through legislation expressing the will of Congress. *See Burnet v. Harmel,* 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932); *Du Val's Estate v. Commissioner of Internal Revenue,* 152 F.2d 103, 104 (9th Cir.1945). In *Burnet,* the Supreme Court considered and rejected Texas law which regards an oil and gas lease as a present sale of the oil and gas in place.[2] It held that bonus and royalties paid to the

lessor constituted income to the lessor rather than a conversion of principal so that the amount received would not be eligible for taxation at the more favorable capital gains rate. As the court noted in *Burnet* 287 U.S. at 110, 53 S.Ct. at 77,

> State law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law ... [for] ... the state law creates legal interests, but the federal statute determines when and how they shall be taxed.

■ Regardless of the characterization of interests in oil and gas properties under Texas law, sections 2031 and 2032 of the Internal Revenue Code do not state or imply that the levy of an estate tax on oil and gas interests is to be determined by reference to state law. The characterization of this property interest under Texas law is therefore not controlling.

### Change in Form of Property

The government also presents weightier arguments, however, relying on a revenue ruling which extrapolates from language in 26 C.F.R. § 20.2032–1(d) to the effect that property interests includible in the estate at date of death continue to be included in the estate at the alternate valuation date, even though such property has "changed in form during the alternate valuation date by being actually received, or disposed of, in whole or in part, by the estate." That regulation, in pertinent part, is set out in the margin.[3]

---

**2.** The court also rejected the theory that federal authorization of a depletion allowance indicated the nature of the interest as an item of real property. *Burnet* 287 U.S. at 111–12, 53 S.Ct. at 77. In *Anderson v. Helvering,* 310 U.S. 404, 408, 60 S.Ct. 952, 954, 84 L.Ed. 1277 (1940) the Supreme Court buttressed this interpretation by describing the depletion allowance as "an act of grace" and an "arbitrary deduction."

**3.** 26 C.F.R. § 20.2032–1(d) reads, in pertinent part, as follows:

> *"Included property" and "excluded property".* If the executor elects the alternate valuation method under section 2432 [sic], all property interests existing at the date of decedent's death which form a part of his gross estate as

determined under sections 2033 through 2044 are valued in accordance with the provisions of this section. Such property interests are referred to in this section as "included property". Furthermore, *such property interests remain "included property"* for the purpose of valuing the gross estate under the alternate valuation method *even though they change in form* during the alternate valuation period by being actually received, or disposed of, in whole or in part, by the estate. On the other hand, property earned or accrued (whether received or not) after the date of the decedent's death and during the alternate valuation period with respect to any property interest existing at the date of the decedent's death, which does not represent a form of "included

The government argues for the proposition that most of the income received in the interim period is not income at all, but represents principal which has merely changed in form, depleting the asset in existence at the date of death.[4] As authority, the government cites Revenue Ruling 71–317, 1971–2 C.B. 328. Purporting to clarify Revenue Ruling 66–348, 1966–2 C.B. 433, Revenue Ruling 71–317 provides that where royalty and working interests are concerned, the "in place"[5] fair market value of the reserves (units of mineral remaining) must be determined as of the alternate valuation date. Without explaining why the net proceeds must be included in the value of the gross estate, Rev.Rul. 71–317 prescribes the method to be used for computing the apportionment.[6] The net production proceeds, lessened only by an "appropriate" discount factor,[7] must be added to the fair market value of the units of mineral remaining as of the alternate valuation date, and are thus included in the gross estate.

A comparison of Rev.Rul. 71–317 with Rev.Rul. 66–348, reveals that Rev.Rul. 71–317, far from merely clarifying the methodology of the earlier ruling, actually represents a marked change in substantive approach. Rev.Rul. 66–348 prescribed an altogether different method for establishing the amount of income to be included in the gross estate. That computation was to be made by valuing 100 percent of the units of minerals extracted and sold during the interim period at their "in place" value[8] *as of the date of disposition*, and including the full amount thereof in the gross estate. Rev.Rul. 71–317, by contrast, discounts by an "appropriate" factor the net proceeds during the entire interim period and adds that figure to the value of the gross estate as of the alternate valuation date. Although the position of the Internal Revenue Service clearly changed between 1966 and 1971, the court has found no case authority supporting either of its interpretations of the statute (26 U.S.C. § 2032) as set forth in these revenue rulings.

Significantly, the methodology of Rev. Rul. 71–317 appears to conflict with § 2032(a)(1), which deals with property distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death. The statute requires that such property "shall be valued as of the date of distribution, sale, exchange, or other disposition," not at the alternate valuation date. It is undisputed that the net production proceeds in issue here resulted from the sale of minerals by the Johnston estate, yet the government would establish the value of these minerals by reference to a date different from that prescribed by the statute.

property" itself or the receipt of "included property" is excluded in valuing the gross estate under the alternate valuation method. Such property is referred to in this section as "excluded property" ... [emphasis added].

**4.** The government apparently takes the position that the net production proceeds are income for purposes of the income tax already paid but principal for purposes of the estate tax.

**5.** "In place" is defined as minerals in their natural state, that is, in the earth prior to extraction.

**6.** "The value of the included property is determined by applying an appropriate discount factor to the net proceeds (net income) from mineral production during the interim period. Such determined value is added to the fair market value of the reserves (units of mineral remaining) as of [the alternate valuation date]. The discount factor used will vary from case to case but will be determined by taking into ac-

count the particular facts of each case, such as producing rate, type of interest owned and economic factors such as interest rates." Rev.Rul. 71–317 in pertinent part.

**7.** The example in the revenue ruling uses 12%. According to the government, such a discount represents a reasonable return on the investment over the six-month period, adding that "The amount of discount from net proceeds under R.R. 71–317 ... would be slight." Government's brief in support of summary judgment at 18. It is undisputed that the inspector ignored the discount formula when he calculated the amount of the deficiency, although the government now concedes that it should be taken into account.

**8.** Plaintiffs describe the "in place" value of oil or gas as "usually about ⅓ of the amount for which it is sold at the surface", citing 21 Oil and Gas Tax Quarterly, 14 at 20 (1972).

What the later revenue ruling has in common with the earlier one is the premise, without accompanying analysis, that "The extraction and sale of minerals from a mineral interest, which formed a part of the decedent's gross estate, during the alternate valuation period is merely a change in the form of 'included property'. It is clear that no portion of the physical assets sold is 'excluded property'." Rev.Rul. 66–348.[9]

Both the taxpayer and the government agree on those cases which the court must consider in determining the issue before it, but each adversary views those cases in a different light. The reasoning underlying those cases necessarily illumines the path which this court must follow, since neither the statute itself, Sec. 2032, nor the accompanying regulation, 26 C.F.R. § 20.2032–1(d) deal specifically with income from mineral interests.[10] In two cases decided within a year of each other, courts presented with the issue held invalid Art. 11 of Regulations 80 (1937 Ed.), which interpreted § 302(j) of the Revenue Act of 1926, as amended by § 202(a) of the Revenue Act of 1935 (a predecessor of present section 2032).

In the leading case of *Maass v. Higgins*, 312 U.S. 443, 61 S.Ct. 631, 85 L.Ed. 940 (1941), the court described the regulation as requiring "that if, during the year subsequent to death, rents, *royalties*, interest or dividends were received by the decedent's estate, such portion thereof as had not accrued, or was not attributable to a period prior to death, should be returned in full and reckoned as part of the gross estate in any case where the executor elected ... to value the assets as of [the alternate valuation date][11] or as of the date of disposition ..." (emphasis added). *Maass* 312 U.S. at 446, 61 S.Ct. at 632. Since the facts of that case dealt only with rents, dividends and interest, the court's opinion did not reach the subject of royalties.

In the lower courts the government had presented an argument similar to its "wasting asset" argument in this case, contending that the disputed items were in truth payments on account of principal and that by such payments the principal was reduced so that at the end of the period, its true value was not reflected unless the payments received in the interim were added to the valuation determined at the end of the period.

The court held, however, that rent, dividends and interest were not to be added, noting that in common understanding such items were income upon which executors were bound, under the revenue acts, to pay tax as income.[12] In the case of a living holder, such receipts are never treated as on account of principal. *Maass* at 447, 61 S.Ct. at 633.

The court concluded that whichever date is selected by the executor, the usual method of valuation should be pursued[13]:

> If Congress intended the result for which the Government contends, namely, that a different method should apply at the end of the [alternate valuation] period than that applicable as of the date of death, it would have been a simple matter so to state.

*Maass* at 448–49, 61 S.Ct. at 633–34.

Because the uniform practice was to val-

---

**9.** As noted earlier, the concept of changing form derives from 26 C.F.R. § 20.2032–1(d), which fails altogether to mention mineral interests.

**10.** Subsections of the regulation do deal, however, with interest, rents, bonds and certain corporate stock. *See* 26 C.F.R. § 20.2031–1(d) (1–4). These items are not includible in the gross estate.

**11.** At that time the applicable statute designated the date one year from date of death as the alternate valuation date.

**12.** This conclusion accords with the holding in *Burnet, supra,* that bonus and royalties constituted income to the lessor, not a conversion of principal, so that the favorable capital gains rate did not apply.

**13.** The property to be valued at the alternate date is the same property required to be included in the gross estate at date of death. 26 C.F.R. § 20.2032–1(a). *See also Clark,* below, at 219.

ue the asset as an entirety,[14] the court found the government's argument that the asset consisted of two elements unreal and artificial. That which had not been legally separated from the asset of which it was an incident had no market value apart from the capital asset itself. *Id.*

While the Supreme Court did not allude to the carefully reasoned opinion issued the previous year in *Clark v. United States*, 33 F.Supp. 216 (D.Md.1940), which invalidated the identical regulation as to stocks and bonds, *Maass* supports the statement in *Clark* at 221 that

> [T]he view advanced by the regulation ignores the real nature of income, which is something arising and *severed from* the principal, and not a growth or an increment of value in the principal [emphasis in original].

*See also Eisner v. Macomber*, 252 U.S. 189, 206–7, 40 S.Ct. 189, 193, 64 L.Ed. 521 (1920).

The concept of separation became the touchstone for later decisions which, in each instance, analyzed whether proceeds during the interim period constituted principal or income by determining whether they had been severed from the asset or added to the asset.[15]

In *Estate of Schlosser*, 277 F.2d 268 (3rd Cir.1960), the court held that a true stock dividend *was* includible in the executor's valuation at the end of the alternate period because there had been "no step toward the severance or distribution of part of the corporate estate." *Schlosser* at 269. Rather than a severance of earnings and profits, the true stock dividend had merely changed the form of the estate's investment by increasing the number of its shares.[16] *Id.*

Relying heavily on the reasoning of *Maass* and *Schlosser*, the court in *Bartram v. U.S.*, 75–1 USTC, Fed. Estate & Gift Tax Rep. (CCH) ¶ 87,375 (D.Conn.1974), decided that a capital gains dividend declared on mutual fund shares during the interim period was not includible in the gross estate. The *Bartram* court acknowledged that the value of a mutual fund share is equal to a *pro rata* share of the fund's net assets, so that the payment of a capital gains dividend reduces the value of the shares then outstanding. Nevertheless, because there had been a transfer of value from the estate, the *Bartram* court found the result logical, stating that under the *Maass* rule, payment of income accrued after death may effectively reduce the estate without incurring estate tax liability. *Bartram* at 87,377.

When the *Maass* rule is applied to the mineral interests involved here, it is apparent that the royalties and production payments which accrued to the Johnston estate during the interim period did not divide the estate's existing ownership into a greater number of smaller units as did the stock dividend in *Schlosser*. *Cf. Schlosser* at 269. On the contrary, the minerals and the monetary proceeds were severed from the estate, thereby diminishing the number of units which had been in the estate at the date of death.

The parties disagree about whether this diminution had the effect of decreasing the value of the gross estate at the alternate valuation date as compared to the value at the date of death. The executor contends that market forces caused the value of the property to increase in that interim, while the government argues that, based on the smaller amount of reserves remaining, the property must have had a lower value.

---

**14.** *See also Burnet v. Harmel*, 287 U.S. 103, 111, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932).

**15.** In no case cited to this court has it ever been decided that payments such as those at issue here constituted *both* principal and income, as the government apparently contends in this case. Moreover, "while the Constitution does *not forbid* double taxation, the intent to impose it on a given receipt is not presumed. We think

that if it had been intended, Congress unequivocally would have so declared." *Maass* 312 U.S. at 448–49, 61 S.Ct. at 633–34. See also *Clark* at 223 (not reasonable to interpret statute as imposing double taxation, unless required by express words).

**16.** The concept of changing form appears also in 26 C.F.R. § 20.2032–1(d), as described, *supra.*

This question need not, however, be decided.

Even if it were true that the value of the estate had diminished during the interim period, the benefit to the estate would harmonize with the purpose of Congress in providing for an alternate valuation date. As the Supreme Court declared in *Maass* 312 U.S. at 446, 61 S.Ct. at 632,

> [T]he purpose of (the predecessor to Sec. 2032) was to mitigate the hardship consequent upon shrinkage in the value of estates during the year following death.

See also *Clark* at 222 (the legislation represented efforts to ameliorate the burden of estate taxation). To require that such interim depletion be added to the value of the asset as established on the alternate valuation date pursuant to Rev.Rul. 71–317 might well defeat the ameliorative purpose of the statute.

This result also accords with the Supreme Court's opinion that "the production of oil and gas ... is treated as an income-producing operation, not as a conversion of capital investment as upon a sale, and is said to resemble a manufacturing business carried on by the use of the soil." *Anderson v. Helvering*, 310 U.S. 404, 407–08, 60 S.Ct. 952, 953–54, 84 L.Ed. 1277 (1940). *See also Burnet* 287 U.S. at 107, 53 S.Ct. at 75 (rejecting argument that net result of a mining operation is a conversion of a capital investment, so that money received is capital in a changed form).

■ In summary, it is the conclusion of this court that proceeds from the extraction and sale of minerals during the interim valuation period do not represent a mere "change in form." As a result, like interest and rents, they are not includible in the gross estate as valued six months from date of death. *See Bull v. U.S.*, 295 U.S. 247, 256, 55 S.Ct. 695, 698, 79 L.Ed. 1421 (1935) ("Had he lived, his share of profits would have been income ... and if the right was not capital to him, it could not be such to his estate"). Not only is Rev.Rul. 71–317 inconsistent with the meaning of the statute, Section 2032, but in many instances the required computation would increase the burden on the taxpayer, preventing executors of estates containing mineral interests from availing the estate of an election valuable to owners of stocks, bonds and rental property.

For the foregoing reasons, the court holds that proceeds derived from oil and gas properties during the six-month period prior to the alternate valuation date constitute income, not principal. The executor shall recover the refund he claims for the Johnston estate, as well as the interest thereon. Accordingly, plaintiff's motion for summary judgment is **GRANTED** and defendant's motion for summary judgment is **DENIED.** Within twenty days of the date of this order, the parties shall agree upon the correct computation of the sum in question and submit a proposed form of judgment.